USDC SDNY
DOCUMENT ELECTRONICALLY FILED
DOC#: _____
DATE FILED: 8/16/18

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**UNITED STATES OF AMERICA,**

-against-

**RAMON PAULINO,**

18-MJ-5372

**MEMORANDUM OPINION**
**ADDRESSING REMAND**
**ORDER**

**ANDREW L. CARTER, JR., United States District Judge:**

> *Honoring the presumption of innocence is often difficult;*
> *sometimes we must pay substantial social costs as a result of our*
> *commitment to the values we espouse. But at the end of the day the*
> *presumption of innocence protects the innocent; the shortcuts we*
> *take with those whom we believe to be guilty injure only those*
> *wrongfully accused and, ultimately, ourselves.*
>
> *Throughout the world today there are men, women, and children*
> *interned indefinitely, awaiting trials which may never come or*
> *which may be a mockery of the word, because their governments*
> *believe them to be "dangerous." Our Constitution, whose*
> *construction began two centuries ago, can shelter us forever from*
> *the evils of such unchecked power. Over 200 years it has slowly,*
> *through our efforts, grown more durable, more expansive, and*
> *more just. But it cannot protect us if we lack the courage, and the*
> *self-restraint, to protect ourselves.*

- Justice Thurgood Marshall, dissenting in *United States v.*
*Salerno*, 481 U.S. 739, 767 (1987), joined by Justice William J.
Brennan Jr.

# INTRODUCTION

No deep reading of history books is necessary to know that widespread pretrial detention is a relatively recent development in American law. A district judge's consideration of a defendant's danger to the community in deciding whether to set bail is a similarly new innovation. Indeed, because, dating back to the English common law until just a few decades ago, pretrial detention was limited to the question of whether the Defendant would return to court, orders of detention were exceedingly rare.

A more common thread over time, however, is that, both historically and under our current system, the Government has always borne the burden of persuading the Court that pretrial detention is necessary. Within our current federal system, the Court can immure a pre-trial defendant if the Government proves that the defendant presents a risk of flight or a danger to the community. Under risk of flight, the Government must prove, by a preponderance of the evidence, both that a defendant presents a risk of flight if not detained and that there are no conditions which will reasonably assure the defendant's presence if she is released. Under dangerousness, the Government must prove, by clear and convincing evidence, not only a defendant's potential danger to the community, but also that no conditions can reasonably assure the safety of any other person and the community. This quite meaningful showing will only apply to a limited number of individuals. This onerous standard also reflects an acknowledgment that as Justice Marshall opined, a defendant's interest in maintaining her liberty before trial is paramount, and an essential component of protecting the presumption of innocence. Due to the tremendous stakes involved, an assessment of whether an individual must be detained before trial must be conducted on a case-by-case basis.

Synthesizing these essential principles, the obvious conclusion is that courts must be vigilant not to unduly rely upon a proffer of a set of accusations and weighty evidence in support thereof to substantiate an order of pretrial detention. After all, in this District, among many others, such a strong proffer is typical. Rather, a careful balancing of all of the relevant factors is essential to ensuring that not even one defendant is unnecessarily deprived of her interest in liberty pending trial, all while protecting the community at large, and, by extension, ensuring the integrity of and respect for the criminal system.

On June 25, 2018, I heard the Government's appeal of the duty magistrate's decision to grant bail to Ramon Paulino, the sole defendant in this matter ("Paulino" or "Defendant"). Although I concluded that the Government had not met its burden in this case, I do not take these allegations lightly. They involve the Defendant and fellow gang members assaulting a minor on the side of a highway in broad daylight. It goes without saying that these activities are dangerous. What the Government has failed to provide, however, is sufficient evidence demonstrating that there are no conditions, such as home incarceration and electronic monitoring, that will reasonably assure the safety of the community. They further failed to demonstrate, for reasons set forth herein, that conditions could not be put in place mitigating any flight risk he presented.

Following my decision, the Government took another appeal to the Court of Appeals for the Second Circuit. On July 30, 2018, the Circuit remanded the case with instruction to elaborate on my rationale for granting bail. This memorandum opinion now expands upon my earlier ruling.

## BACKGROUND

### A. The Charges

This case arises out of a multi-year, ongoing investigation in this District of a gang known as the "Trinitarios," operating in the New York City area and elsewhere and comprised primarily

of males of Dominican descent. Complaint ("Compl.") ¶ 6. The Trinitarios have certain measures to ensure the loyalty of their membership, Compl. ¶¶ 8a–8d, and have rivalries with other gangs in the New York area. Compl. ¶ 8e. Their ongoing rivalry with the "Bloods" gang has resulted in fights both in prison and on the streets. Compl. ¶ 8e. Many members of the Trinitarios sell narcotics in the area and smuggle drugs into prisons. Compl. ¶ 8f.

On June 18, 2018, a passenger in a car travelling near the East Gun Hill Road Exit of the Bronx River Parkway in the Bronx, New York observed, and produced video footage of, approximately twelve individuals, among them Paulino, beating and stabbing a minor victim (the "Victim") during the day in the median strip of the multi-lane highway. Compl. ¶ 9; *see* Video of Incident. The Victim was a member of the "Grizzlies," a set of the "Bloods" gang. Compl. ¶ 13. As corroborated by the bystander's video and further photographs, an eyewitness identification via a photo array, as well as a confession later obtained from Paulino, Paulino lifted a piece of wooden debris over his head and slammed it downward two times in the vicinity of where the Victim was lying. Compl. ¶ 10, 15, 16; *see* Video at 00:02–00:06.[1] The eyewitness observed Paulino actually hitting the Victim with the debris. Compl. ¶ 15. At the end of the video, an individual appearing to be the Victim gets up and starts to walk away from the scene. Video at 00:10–00:19.

After several bystanders called 9-1-1, law enforcement officers responding to the scene observed a group of individuals, including Paulino, running away from the location of the assault. Compl. ¶ 14. The NYPD arrested Paulino and transported him to the precinct, where he was *Mirandized*, interviewed, then released. Compl. ¶¶ 14, 16. Paulino admitted that he was in a park

---

[1] The Complaint alleges that Paulino used a "large log" to assail the Victim, but also suggests that an eyewitness described it as a "tree branch." Compl. ¶¶ 10, 15. However, based on what the video depicts of the weapon and the rapid motion in which Paulino downwardly swings it, it is far more plausible that the weapon was something lighter than a log, such as a branch or a piece of wooden debris that might commonly be found on the shoulder of a well-trafficked transit route, such as a piece of broken railroad track.

adjacent to the location of the assault with various members of the Trinitarios, before they chased after the Victim and he followed. Compl. ¶ 16b. He admitted to witnessing the assault of the Victim, but he denied participating in it. Compl. ¶ 16a-c.

According to hospital personnel, the Victim was stabbed approximately thirteen to sixteen times, with stab wounds in his lung and kidney. Compl. ¶ 11a. The Victim went into cardiac arrest on the way to the hospital, but was revived, and later received emergency surgery to address his wounds. Compl. ¶¶ 11b–c. Friends of the Victim later indicated that a high-ranking Trinitarios member had ordered a "hit" on the Victim on account of a dispute between the Victim's girlfriend and a female member of the Trinitarios. Compl. ¶ 12.

On or about June 21, 2018, Paulino was re-arrested, *Mirandized*, and agreed to be re-interviewed by investigators. Compl. ¶ 16. Paulino again denied having participated in the assault, but after being shown the bystander's video, he admitted his involvement, and that he was the one swinging the wooden debris near the Victim. Compl. ¶ 16c. Although initially denying membership in the Trinitarios, he later admitted it. Compl. ¶ 16d.

On June 22, 2018, the Government filed a criminal complaint charging Paulino with one count of assault with a deadly weapon in aid of racketeering (18 U.S.C. §§ 1959(a)(2), (3)). Compl. ¶ 1.

**B. Mr. Paulino's Personal Characteristics and Criminal History**

Paulino was born in New York City and was 21 years old at the time of the offense. Pretrial Services Report at 2. He spent a significant portion of his childhood—from 1998 to 2009—in the Dominican Republic with his father, three paternal siblings, and other extended relatives. *Id.* However, for the last nine years, Paulino has resided with his mother, sister, and niece at his mother's apartment in the Bronx. *Id.* Paulino's mother stays at home during the days.

*See* 6/25/18 Tr. at 28:9–11. In addition to other family ties in New York City, Paulino also has family residing in Massachusetts and Virginia. Pretrial Services Report at 2. Paulino reported that he has an expired U.S. passport, and that he has traveled only to the Dominican Republic. *Id.* He is expecting his first child in October 2018. *Id.*

Paulino reported no significant physical or mental health issues, other than asthma as a child. *Id.* He further disclosed weekly use of cannabinoids, beginning at age 17. *Id.* at 3. He previously worked as a delivery person for Haina Restaurant in the Bronx, and before that as a construction worker, but had been employed for approximately four months leading up to his arrest. *Id.* at 2. He did not report any financial information. *Id.*

Turning to the Defendant's criminal history, on June 10, 2014, at age 17, he was arrested in the Bronx for criminal mischief and possession of burglar tools. *Id.* at 3. On August 12, 2015, he was convicted upon plea of guilty to one count of possession of burglar tools, a Class A misdemeanor, and sentenced to three years' probation. *Id.* A 30-day order of protection was also imposed. *Id.* Over the course of the case, Paulino was returned on bench warrants four times. *Id.* On October 1, 2015, Paulino was arrested in the Bronx for criminal mischief, but no disposition has been reported to date. *Id.* at 4.

On February 19, 2018, Paulino was arrested for, *inter alia*, second-degree menacing. *Id.* According to the arrest report, Paulino is alleged to have, along with four other defendants, approached the complaining witness's front door, stating that he wanted to fight her daughter's boyfriend. NYPD Arrest Report at 1. Another defendant opened the complainant's door and entered her house without her permission or consent to assault her daughter's boyfriend. *Id.* However, the complaining witness blocked the entryway and forced him out. *Id.* Paulino held a

wooden bat and glass bottle and stated "tell him to come out so I can fight him." *Id.* When the police attempted to apprehend Paulino, he flailed his arms and legs. *Id.*

On April 26, 2016, the case was resolved upon a plea to disorderly conduct (a violation), with a sentence of a conditional discharge and an order of protection of an unspecified duration. Pretrial Services Report at 4. There is no indication that Paulino was charged with having violated the terms of his supervision as a result of this case.

### C. Procedural History

On June 22, 2018, Defendant was presented before Magistrate Judge Pitman and a bail hearing was conducted. Following oral argument, Judge Pitman concluded that bail conditions could be set that would mitigate the risk of nonappearance and dangerousness to the community, though the latter was of greater concern. 6/22/18 Tr. at 28:4–10. The Court further reasoned that home incarceration enforced by a GPS system would, at the least, ensure that Paulino would not come in contact with the victim, as Judge Pitman had no reason by assume Paulino would cut the electronic bracelet off. *Id.* at 27:8–13. Bail was set at a $100,000 bond, to be cosigned by three financially responsible persons with the following additional conditions: strict Pretrial Services supervision to include home incarceration enforced by GPS monitoring, travel restricted to the Southern and Eastern Districts of New York, surrender of all travel documents, no new applications to possess a firearm, destructive device or other weapon, and submission to a urinalysis, and, if positive, drug treatment. Pretrial Services Report at 1.

The Government appealed Judge Pitman's ruling to the Part 1 judge, and I heard oral argument on June 25, 2018 as part of my duties as the judge then assigned to Part 1. After that hearing, at which approximately one dozen family members were present, I determined that, considering the factors listed in 18 U.S.C. § 3142(g), the Government failed to meet their burden

of demonstrating dangerousness or risk of flight such that no conditions could be set to reasonably assure the safety of the community and the defendant's appearance. 6/25/18 Tr. at 35:18–36:1, 48:4–9; *see id.* at 27:1–11, 49:19–50:25 (noting presence of family members). I concluded that the conditions established by Judge Pitman would reasonably assure that Paulino appears in court and reasonably assure the safety of the community. *Id.* at 36:2–7, 48:9–12. The appeal was, thus, denied. *Id.*

The Government further appealed the matter to the Court of Appeals for the Second Circuit. In an order dated July 30, 2018, the Circuit remanded this case for further consideration. *See United States v. Paulino*, No. 18-1901 (2d Cir. July 30, 2018) (Dkt. No. 42). In its decision, the Court acknowledged that, while ruling from the bench, I had stated that I had considered all of the relevant statutory factors, concluding that the Government had not carried its burden of proof. *Id.* However, the Court reasoned that my ruling did not sufficiently "explain in detail how [I] weighed the statutory factors in arriving at [my] conclusion." *Id.* Noting that the Government mostly limited its arguments on appeal to dangerousness (and whether there were conditions that could reasonably assure the safety of the community), the Court noted I had emphasized the seriousness of this offense, Paulino's criminal history, and the weight of the evidence against him, but failed to sufficiently explain the rationale for my conclusion that the Government had not carried its burden despite that evidence. *Id.* Accordingly, the case was remanded for supplementation of the record, with permission to either party to restore the appeal upon completion of these proceedings.[2]

---

[2] Upon remand, the parties each submitted additional letter briefing regarding the issues that the Circuit raised in its decision. However, in accordance with the directive to "elaborate on [the] rationale" of my June 25, 2018 decision to grant bail, this opinion is limited to the arguments raised and matters that I considered in conjunction with that decision. In any event, even if I were to consider the parties' supplemental submissions, they would not alter this decision.

## DISCUSSION

### A. Bail, Generally

Liberty before a criminal trial is, and has always been, the "norm." *See United States v. Salerno*, 481 U.S. 739, 755 (1987). Under English common law, pretrial detention was presumed for all accused, even of the most severe crimes, due to the presumption of innocence. Shima Baradaran, *Restoring the Presumption of Innocence*, 72 Ohio St. L.J. 723, 728-29 (2011). Bail was set for only one reason: ensuring a defendant's appearance in court. *Id.* at 732. A defendant would have to locate a surety before being released, and that surety would only lose their financial deposit if a defendant did not appear for trial. *Id.* at 733 (citation omitted). Thus, bail was less a question of "if" a defendant would be released, but rather "how" that would occur. *Id.* at 728-29.

Early American practices were much the same. *Hudson v. Parker*, 156 U.S. 277, 285 (1895) (suggesting that purpose of bail is to ensure defendant's appearance at trial); *see* Laura I. Appleman, *Justice in the Shadowlands: Pretrial Detention, Punishment, & the Sixth Amendment*, 69 Wash. & Lee L. Rev. 1297, 1335 (2012) ("[A]lthough the specific intent of the Framers regarding bail cannot be conclusively determined, all the available evidence points to the fact that pretrial detention, both under the English common law and at the time the Constitution was written, was limited to flight risk."). The "first federal statement on bail" came in the Judiciary Act, which promised bail for all noncapital defendants, leaving bail for capital defendants to a judge's discretion. Baradaran, *supra*, at 729 (citing Judiciary Act of 1789, ch. 20, § 33, 1 Stat. 73, 91). The Eighth Amendment represents the Constitution's only direct reference to pretrial detention or bail, providing that "[e]xcessive bail shall not be required." U.S. Const. amend. VIII. Nonetheless, courts throughout the nineteenth and a large part of the twentieth centuries seemed to concur that, under the Constitution, the accused was entitled to pretrial release except in capital cases, and that

the denial of bail violated the presumption of innocence. Baradaran, *supra*, at 730-31 (surveying cases); *see Stack v. Boyle*, 342 U.S. 1, 4 (1951) ("Unless [the] right to bail before trial is preserved, the presumption of innocence, secured only after centuries of struggle, would lose its meaning."). Thus, bail was still "generally presumed for the accused" in noncapital cases, and courts were not permitted to weight evidence against a defendant in such cases. Baradaran, *supra*, at 731.

In 1944, Federal Rule of Criminal Procedure 46 provided that the weight of the evidence against a defendant could be considered by a judge in assessing whether a defendant would appear. *Id.* This revision "opened the way for later, more expansive determinations of defendant's guilt before a jury trial." *Id.* The 1966 Federal Bail Reform Act took the next step. *See* Bail Reform Act of 1966, Pub. L. No. 89-465, 80 Stat. 214; H.R. Rep. No. 89-1541, at 5, 8-9 (1966), *as reprinted in* 1966 U.S.C.C.A.N. 2293, 2299. While still favoring pretrial release, the 1966 Act "expanded reasons judges could legitimately deny bail[,]" including consideration of the weight of the evidence against a person. Baradaran, *supra*, at 740. It also empowered judges to impose more conditions on release, as well as deny release in noncapital cases. *Id.* With the increased discretion afforded judges came enhanced public scrutiny of violent crimes by people released pretrial, which in turn resulted in some jurisdictions enacting laws authorizing the consideration of a defendant's dangerousness. *Id.* at 740-41.

Thus, although not necessarily intended by the 1966 Act, consideration of whether a defendant presented a public safety risk nonetheless seeped into bail analyses during the period that followed. Clara Kalhous & John Meringolo, *Bail Pending Trial: Changing Interpretations of the Bail Reform Act and the Importance of Bail from Defense Attorneys' Perspectives*, 32 Pace L. Rev. 800, 813 (2012) (discussing how between 1966 and 1984, "federal courts were taking matters into their own hands, effectively denying bail in cases where they deemed defendants to be

dangerous by setting inordinately high bail, albeit on stated grounds of risk of flight."). The Supreme Court began to chip away at the notion that pretrial detention should be a rare circumstance. *See, e.g., Bell v. Wolfish*, 441 U.S. 520, 533, 539 (1979) (holding that "[t]he presumption of innocence is a doctrine that allocates the burden of proof in criminal trials" and suggesting that pretrial detention is not punishment if related to a legitimate governmental objective).

This set the stage for the Bail Reform Act of 1984 ("BRA"), which "dramatically" altered the scope of federal bail provisions by including consideration of danger to the community as a relevant factor, and authorizing pretrial detention where "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." *United States v. Chimurenga*, 760 F.2d 400, 403 (2d Cir. 1985) (quoting 18 U.S.C. § 3142(e), (g)(4)). This shift demonstrated "the deep public concern . . . about the growing problem of crimes committed by persons on release" and a "recognition that there is *a small but identifiable group of particularly dangerous individuals* as to whom neither the imposition of stringent release conditions nor the prospect of revocation of release can reasonably assure the safety of the community." *Id.* (emphasis added) (quoting S. Rep. No. 98-225, at 6–7, *as reprinted in* 1984 U.S.C.C.A.N., at 3188–3189).

The Supreme Court held that pretrial detention under the BRA on the grounds of likelihood of future dangerousness comported with the Eighth Amendment's prohibition of excessive bail as well as the Due Process Clause. *Salerno*, 481 U.S. at 752, 754-55. Notwithstanding that holding, the BRA itself requires that a court should "bear in mind that it is only a 'limited group of offenders' who should be denied bail pending trial." *United States v. Shakur*, 817 F.2d 189, 195 (2d Cir. 1987) (quoting S. Rep. No. 98–225 at 7, *as reprinted in* 1984 U.S.C.C.A.N. 3182, 3189);

*see Salerno*, 481 U.S. at 755 (suggesting that "detention prior to trial or without trial is the carefully limited exception" to liberty before trial). One charged with a crime is, after all, presumed innocent. *Stack*, 342 U.S. at 4. A single individual unnecessarily detained before trial is one individual too many, and the increasing use of the practice places tremendous wear on our constitutional system. *United States v. Montalvo–Murillo*, 495 U.S. 711, 723–24 (1990) (Stevens, J., dissenting, joined by Brennan and Marshall, JJ.). Due to the crucial interests involved, it follows that a "case-by-case" approach is required at any stage of the case in assessing the propriety of pretrial detention. *See United States v. Gonzales Claudio*, 806 F.2d 334, 340 (2d Cir. 1986) (citations omitted) (discussing due process analysis for evaluating propriety of prolonged pretrial detention, and the interests at stake), *cert. dismissed sub nom., Melendez-Carrion v. United States*, 479 U.S. 978 (1986).

Indeed, as the Second Circuit once opined in the context of sentencing, "[i]n an age of staggering crime rates and an overburdened justice system, courts must continue to be cautious to avoid the appearance of dispensing assembly-line justice." *United States v. Li*, 115 F.3d 125, 133 (2d Cir. 1997). This rule applies with no less force in the context of a bail determination.

### B. Applicable Legal Standards

#### 1) Burdens of Proof

The BRA has been construed to require that a district judge conduct a *de novo* review of a magistrate's bail determination. *E.g.*, *United States v. Gotti*, 358 F. Supp. 2d 280, 282 (S.D.N.Y. 2005). Thus, a district judge hearing a bail appeal must exercise its independent judgment, and not defer to the magistrate. *United States v. Leon*, 766 F.2d 77, 80 (2d Cir. 1985).

As noted above, the BRA permits a district court to order pretrial detention only if it concludes "that no condition or combination of conditions will reasonably assure the appearance

of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1).

Thus, to obtain an order of pretrial detention on the basis of dangerousness, the Government must demonstrate by clear and convincing evidence that a defendant poses a risk of danger to others, and that no conditions "will reasonably assure . . . the safety of the community." *Chimurenga*, 760 F.2d at 405. Clear and convincing evidence "means something more than 'preponderance of the evidence,' and something less than 'beyond a reasonable doubt.' " *Chimurenga*, 760 F.2d at 405. Put another way, a detention order must draw upon evidence that provides "a high degree of certainty" as to danger. *Id.*

To detain a defendant as a risk of flight, a court must determine by a preponderance of the evidence that the defendant "presents a risk of flight if not detained," and that no set of conditions "reasonably will assure the presence of the defendant at trial if he is released." *Shakur*, 817 F.2d at 194–95; *see United States v. Yannai*, 791 F.3d 226, 242 (2d Cir. 2015) (defining "preponderance of the evidence" as "which circumstance was more likely than not").

In making this determination, the Court considers the record before it in light of the factors enumerated in 18 U.S.C. § 3142(g). These factors include (1) "the nature and circumstances of the offense charged;" (2) "the weight of the evidence against the person;" (3) "the history and characteristics of the person" including, among other factors, family ties, employment, financial resources, past conduct, criminal history, and whether the person was on release pending trial; and (4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." *Id.* The weight afforded to each factor under section 3142(g) is within the "special province" of the district court. *Shakur*, 817 F.2d at 196 (citation omitted).

Where a defendant is charged with certain enumerated offenses, a rebuttable presumption arises that no conditions can provide the requisite assurances. *See* 18 U.S.C. § 3142(e)(3). In such a case, "the defendant bears a limited burden of production—not a burden of persuasion—to rebut that presumption by coming forward with evidence that he does not pose a danger to the community or a risk of flight." *United States v. English*, 629 F.3d 311, 319 (2d Cir. 2011) (quotation omitted). A defendant's satisfying this burden "does not eliminate the presumption" but rather "remains a factor to be considered among those weighed by the district court." *Id.* (quotation omitted). Regardless, in a presumption case, the Government still bears the burden of persuasion of demonstrating dangerousness by clear and convincing evidence and risk of flight by a preponderance of the evidence. *Id.* (citation omitted).

Here, however, it is undisputed that Defendant is not charged with an offense giving rise to the statutory presumption. *See* 6/25/18 Tr. at 2:13–16.

### 2) Adequacy of Conditions

The Second Circuit has had no shortage of opportunities to opine on the degree to which home incarceration and location monitoring can effectively mitigate a defendant's dangerousness or risk of flight. The first major case on the subject came shortly after the introduction of the BRA in *United States v. Colombo*, 777 F.2d 96 (2d Cir. 1985). Anthony Colombo operated a criminal enterprise known as the "Anthony Colombo crew" which committed an array of crimes, including murder, robbery, and narcotics-related offenses which Colombo had personally directed. *Id.* at 97. The district court agreed that Colombo was a danger to the community, but set release conditions, prohibiting him from associating or communicating with other named defendants, appearing at his place of employment (the alleged center of criminal activities), and reporting regularly to pretrial services, among other things. *Id.* at 98–100. The Second Circuit reversed, concluding that these

conditions were inadequate to protect the public because they did not prohibit Colombo from communicating with others in the criminal enterprise or otherwise continuing to run it. *Id.* at 99–100.

Subsequently, in *United States v. Orena*, 986 F.2d 628 (2d Cir. 1993), the Circuit confronted facts similar to *Colombo*, but a slightly more "complete" set of conditions. *Id.* at 632 (discussing *Colombo*). The two defendants in that case—Orena and Amato—also faced racketeering charges (based on predicate acts including murder, loansharking, and illegal weapons possession) for their activities as "Acting Boss" and "Captain" in an organized crime ring. *Id.* at 628. The evidence that they were responsible for a "bloody, fratricidal war" was strong. *Id.* at 631. The district court nonetheless set the following conditions, among others: home confinement, restrictions on visitors and phone calls, the installation of a device to monitor calls, and that Defendants wear electronic bracelets and to call pretrial services once a day. *Id.* at 630. The Circuit rejected them, reasoning that they "sought to achieve the same goal" as in *Colombo* by limiting the activities of the ring, but failing to provide any assurance that the dangers to the public were "controlled or diminished." *Id.* at 632 (quoting *Colombo*, 777 F.2d at 99).

The court further explained that house arrest, electronic surveillance, and limiting interactions to immediate family would "elaborately replicate a detention facility without the confidence of security such a facility instills." *Id.* at 632 (quoting *Gotti*, 776 F. Supp. at 672). Without paid, trained staff constantly on duty to ensure compliance, protection of the community would be "left to the word of [the Defendant] . . . ." *Id.* at 633. Of further concern was that "electronic surveillance systems c[ould] be circumvented by 'the wonders of science and of

sophisticated electronic technology,' and that the monitoring equipment can be rendered inoperative." *Id.* at 632 (quoting *Gotti*, 776 F. Supp. at 672–73).

Several subsequent Second Circuit cases have echoed the doubts of the *Orena* Court regarding these methods. *See, e.g.*, *Dono*, 275 F. App'x at 37 (rejecting similar bail package that included promise that father, retired police officer, take "personal responsibility" for the defendant while released) (citing *Orena*, 986 F.2d at 632–33); *United States v. Mercedes*, 254 F.3d 433, 436–37 (2d Cir. 2001) (rejecting similar bail package that included assurances from Defendant's fiancée) (citing *Orena*, 986 F.2d at 632–33).

However, these cases, as well as *Orena* and *Colombo*, were all presumption cases. *See Sabhnani*, 493 F.3d at 77–78 (distinguishing *Orena* on this ground); *see Dono*, 275 F. App'x at 36–37; *Mercedes*, 254 F.3d at 436; *Colombo*, 777 F.2d at 98. The facts of *Sabhnani*—a non-presumption case where the Second Circuit approved of home monitoring and electronic surveillance, among other conditions—thus warrant some discussion. There, a wealthy husband and wife were charged with two counts of forced labor and two counts of harboring illegal aliens, and were alleged to "have held two Indonesian women in peonage at their Long Island home, denying them freedom of movement, subjecting them to serious physical abuse, and paying them [extremely minimal] wages." *Sabhnani*, 493 F.3d at 65. The misconduct alleged included prolonged periods of starvation, being forced to sleep on a floor mat, and physical abuse that included "beatings with a stick, flesh cuts made with a small knife, and burns inflicted by throwing scalding water." *Id.* at 66. This was corroborated by, among other things, photographs of scars and bruises. *Id.* The district court had concluded that the husband and wife were a risk of flight, in light of, among other things, their extensive financial resources. *Id.* at 72–73. And though the magistrate had approved of a bail package with home detention with electronic monitoring, with

16

expenses borne by Defendants, *id.* at 68, the district court took issue with Defendants' insufficient financial disclosures, and further found home detention "impractical because it would require the imposition of onerous monitoring conditions on defendants' children . . . ." *Id.* at 73.

The Defendants appealed, and the Circuit vacated and remanded, concluding that the physical restrictions proposed by the parties—which included home confinement, electronic monitoring, 24-hour visual surveillance with on-side private security guards—were "extraordinary." *Id.* at 77, 79. In so reasoning, the Court of Appeals distinguished *Orena* in a number of ways beyond it having been a presumption case. *Id.* at 77–78. Notably, the visual surveillance and home monitoring was more extensive than the *Orena* conditions, thus "minimizing the risk of circumvention." *Id.* at 78 (citation omitted). That Defendants would pay all surveillance and security costs "avoid[ed] the drain on limited government resources discussed in *Orena.*" *Id.* (citation omitted). And, the Government's having selected the private security firm to be hired by Defendants assured the competency and integrity of those methods. *Id.* Finally, the Court noted that, though both cases involved alleged violence, the circumstances were "not comparable" to the bloody crime war in *Orena*, because the *Sabhnani* Defendants limited their violence to two victims in their home, and the Government did not contend that the *Sabhnani* Defendants posed a "further threat" to those victims or others. *Id.* The Court thus held there was "no reason . . . to think that the proposed conditions of home confinement cannot reasonably mitigate any concerns about defendants' risk of flight." *Id.*

### C. Analysis

As the following individualized analysis reflects, the Government has failed to carry its burden of proving that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community. The

Court concludes that the conditions set by Judge Pitman are more than adequate to mitigate any concerns regarding dangerousness or risk of flight that might exist.

### 1) Dangerousness

As to the severity of the allegations, at argument, each side understandably staked out positions at opposite poles. But the reality is that this case likely falls somewhere closer to the tropics on a hypothetical globe of violent criminal conduct. Certainly, this is neither the worst case the U.S. Attorney's Office has ever seen (6/25/18 Tr. at 23:14–15), nor was it a schoolyard fight in which Paulino merely got in "two licks" (6/25/18 Tr. at 25:4–6). But, it is safe to say that this was a brutal and heinous attack, in which the Victim was so badly beaten and stabbed that he went into cardiac arrest, was left hospitalized, and required emergency surgery. It is a crime of violence, one which the law, and the Court, takes very seriously. *See* 18 U.S.C. § 3156(a)(4) (defining crime of violence as "an offense that has an element of the offense the use, attempted use, or threatened use of physical force against the person or property of another"). Whether Paulino's personal involvement was simply impulsive, or whether he was aware of the alleged "hit" on this rival gang member, the conduct he is alleged to have undertaken conveys an unacceptable disregard of human life. That this is just one episode of prolonged gang violence taking place in this District only exacerbates the severity of the offense conduct.

Certainly, the evidence against Defendant appears to be weighty. The nature of the attack is corroborated by a cell-phone video starting mid-way through the attack up to its conclusion seconds later. *See United States v. Dono*, 275 F. App'x 35, 37 (2d Cir. 2008) (suggesting that audio recording of assault was "overwhelming evidence"). Not only the video and photographs, but also bystander accounts and Paulino's own words identify him as the individual swinging an object downward at the Victim. However, the case is in its infant stages. *Cf. United States v.*

*Ferranti*, 66 F.3d 540, 543 (2d Cir. 1995) (implying that presence of indictment strengthened showing of dangerousness). To avoid punishment for a crime for which a defendant "has not yet been shown to have committed," many courts have suggested that the weight of the evidence is the least important of the various factors. *United States v. Alston*, 420 F.2d 176, 179 (D.C. Cir. 1969); *accord United States v. Motamedi*, 767 F.2d 1403, 1408 (9th Cir. 1985) (Kennedy, J.). Thus, the Court is cautious to afford this factor undue weight.

Paulino presents *some* danger to the community if he were simply released with no conditions. But the circumstances of the instant offense, and Paulino's specific role in it, as well as the lack of certain aggravating factors, are notable to the Court in assessing whether there are no conditions that would reasonably assure the safety of the community. The attack itself, while allegedly premeditated, does not appear to have been carried out with any measure of advance planning or sophistication on Paulino's part, or that of anyone involved. *Cf. United States v. Morrison*, No. 04-CR699 (DRH) (S-2), 2009 WL 2973481, at *4 (E.D.N.Y. Sept. 10, 2009) (denying bail in presumption case where "defendant [was] a cunning individual with dangerous proclivities who typically enlist[ed] others to violate the law on his behalf"). It occurred in the median of a highway in broad daylight, required crossing multiple lanes of traffic, and involved what appear to have been improvised weapons. This senseless violence certainly cannot be condoned, but it must be emphasized that it is exactly that: senseless. To be deemed a safety risk, Defendant need not be a criminal mastermind. But it seems clear that he is not one.

Moreover, the Government has not presented any evidence suggesting that Paulino led this attack, or otherwise occupied a leadership position within the Trinitarios. *Cf. United States v. Cirillo*, 149 F. App'x 40, 43 (2d Cir. 2005) (upholding detention order of acting boss of crime family, but suggesting that, even for organized crime leaders, there is "no per se rule requiring . .

. detention"). Nor is there a suggestion that he instigated the attack. *Cf. United States v. Katona*, 204 F. Supp. 2d 410, 412 (E.D.N.Y. 2002) (denying bail application in gang assault presumption case where defendant initiated the assault, which involved planning and travel on defendant's part). The video evidence suggests that Paulino was acting, at most, as a henchman or follower within a group of many young men, most of whom were assailing the Victim as well. The Government need not prove that Paulino had any enhanced role in order to prove dangerousness. But the fact that such proof is not required does not eliminate consideration of Paulino's role in the offense, and in the gang generally. His role not only relates to his history and characteristics, but also contributes to assessing the specific danger that releasing Paulino possibly presents: that he may show up with a group of Trinitarios to beat or hector the gang's enemies. As will be explained more fully below, this danger can be effectively mitigated with home incarceration and electronic monitoring.

Regarding Defendant's other personal characteristics, though he has a criminal history, it is not as substantial as one might expect for someone deemed so dangerous that pre-trial detention is mandated, consisting of one 2018 disorderly conduct conviction (a violation) and one 2015 conviction for possession of burglar's tools (a misdemeanor). *Compare United States v. Vasconcellos*, 519 F. Supp. 2d 311, 319 (N.D.N.Y. 2007) (concluding that conditions could be set in presumption case despite two prior misdemeanor convictions), *with United States v. Giles*, No. CRIM. A.96-CR-22(RSP), 1996 WL 172659, at *3 (N.D.N.Y. Apr. 11, 1996) (Pooler, J.) (concluding that prior criminal history "weighs against pretrial release" in light of prior class B felony convictions). Perhaps more notably, the allegations underlying the early-2018 case are entirely consistent with his behavior in the instant offense. Though the Court takes allegations of menacing quite seriously, it notes that, again, Paulino did not act alone, but appeared in the group

outside someone's home. Though he is alleged to have threatened the complainant, again, it does not appear that he was leading the group, but was a mere lackey, there at most for his muscle.

And, of course, this incident—Paulino's first arrest since 2015—does not amount to any *pattern* of illegal activity on his part leading up to the instant offense. *Cf. United States v. Cicale*, No. 06-CR-285 (NGG), 2006 WL 2252516, at *6 (E.D.N.Y. Aug. 7, 2006) (denying bail to RICO Defendant on dangerousness grounds, citing more extensive record of recent criminality than at issue here).

Also warranting discussion is Paulino's history on supervised release, which bears on dangerousness in the sense that "past behavior best predicts future behavior and whether the court can rely on a defendant's good faith promises[.]" *United States v. Barnett*, No. 5:03-CR-243 (NAM), 2003 WL 22143710, at *12 (N.D.N.Y. Sept. 17, 2003) (suggesting that violations of supervised release and/or bench warrants demonstrate defendant's flight potential and inability to meet the court's demands). During his 2014-15 case, the Court issued four bench warrants for Paulino. However, without more information, the Court affords these violations limited weight, as they occurred approximately four years ago, when Paulino was essentially of high-school age, and were limited to one case. *See United States v. Dickson*, No. 17-MJ-01086-JJM, 2017 WL 3667644, at *4–*5 (W.D.N.Y. Aug. 25, 2017) (considering recency of violations of supervised release, along with other factors, as relevant to rebut statutory presumption of danger).[3]

---

[3] As an aside, it is worth noting that bench warrants are issued so frequently (nearly 4 in 10 people who receive criminal summonses fail to appear in court) that, this last year, the City of New York has implemented a program of sending text reminders to defendants regarding their court dates and the consequence of failures to appear. Press Release, City of New York, New Text Message Reminders for Summons Recipients Improves Attendance in Court and Dramatically Cuts Warrants (Jan. 24, 2018), available at https://www1.nyc.gov/office-of-the-mayor/news/058-18/new-text-message-reminders-summons-recipients-improves-attendance-court-dramatically [Permanent Link: goo.gl/wb9oVG]. This system has been found to decrease rates of failure-to-appear in court by 36 percent, preventing thousands of warrants each year. *Id.* Thus, the Court cannot help but wonder whether a 17-year-old Paulino might have appeared in court had he received such reminders.

That Paulino committed the instant offense and the conduct underlying the menacing arrest while still on supervised release from his 2015 case does undercut his argument to a certain degree. However, Paulino, who appears to have otherwise adhered to his supervised release over the preceding three years, was not accused of violating his supervised release as a result of the menacing arrest. Though his record is not spotless, Paulino's failures on supervised release are neither numerous nor substantive enough to be indicative of not being able to meet the Court's demands. *Cf. United States v. Williams*, 654 F. App'x 3, 4 (2d Cir. 2016) (affirming district court's detention order citing Defendant's "flagrant disregard for court orders of both civil and criminal cases") (quotation marks omitted); *United States v. Combs*, No. 10-CR-360A, 2011 WL 2110795, at *3 (W.D.N.Y. May 26, 2011) (considering numerous violations of supervised release as relevant). This is, after all, Paulino's first felony case and first case in the federal system. The nature of supervision will differ from his prior state cases, and with the proper conditions, he should be afforded an opportunity to demonstrate he can comply in this context.

Paulino reports no mental health issues. Though Paulino has self-reported weekly marijuana use, the Government has presented no evidence demonstrating a nexus between that drug use and the offense conduct, or other risky behavior. The Court thus concludes that it is unlikely that Defendant's personal use rises to the level of posing a public danger. *See United States v. Arizaga*, No. 16-CR-89 (LTS), 2016 WL 7974826, at *3 (S.D.N.Y. Dec. 22, 2016) (record of limited use of marijuana for medical purposes, despite its illegal nature, was unlikely to "pose a public danger"); *cf., e.g.*, *United States v. McIndoo*, No. 1:15-CR-00142 EAW, 2016 WL 5092637, at *11–*12 (W.D.N.Y. Sept. 19, 2016) (ordering defendant detained in presumption case where defendant had a number of mental health issues, compounded by daily marijuana and semi-

regular cocaine use, and there was some apparent connection between drug use and prior purchases of illegal firearms).

It appears that Paulino has resided in a suitable and stable residence with his mother for nearly a decade, and the Government has made no showing casting doubt on the quality of his living situation. *Cf. Combs*, 2011 WL 2110795, at *3 (considering lack of "suitable residence" for defendant as supporting finding of dangerousness). He also has extensive family support, as demonstrated by the numerous supporters present at the hearing before me. Among other resources, his aunt travelled from Virginia with the intent to stay and supervise him while the case is pending. 6/25/18 Tr. at 27:5–11. Paulino is also expecting a child in October, ostensibly providing an incentive not to commit further crimes.

Thus, while the Government has shown that Paulino presents some danger to the community, they have not proven by clear and convincing evidence that no conditions could be set that reasonably assure the safety of the community. The strict release requirements imposed by Judge Pitman, including, but not limited to, a $100,000 bond, home incarceration enforced by GPS monitoring, limited travel and surrender of all travel documents, reasonably assure the safety of the community.

Here, as in *Sabhnani*, there is no presumption, and thus the Government must bear the burden of demonstrating the inadequacy of home incarceration and electronic monitoring. And though this case differs from *Sabhnani* in a few obvious ways, the Government has similarly failed to demonstrate, with clear and convincing evidence, that the proposed home confinement and electronic monitoring would not "reasonably mitigate" any concerns that Defendant is a safety risk. *Id.*

Although *Sabhani* was a risk of flight case, the violent conduct in this case, though certainly severe, is no more severe than that at issue in *Sabhnani*. The primary distinction is that Paulino is a member of the Trinitarios. However, *Orena* does not suggest, nor would the Court be justified in concluding, that gang membership alone renders these conditions ineffective. If anything, the *Colombo-Orena* line of cases reflects a unique concern with *leaders* of gangs, or at the least primary actors in gangs.

Expanding the *Orena* rule accordingly would have the effect of rendering any individual charged with an assault in aid of racketeering offense too dangerous for release under such conditions, which would constitute an abandonment not only of the presumption, set by Congress, in favor of release, but of the individualized inquiry required when considering conditions under the statute and relevant case law.

Indeed, the speculative nature of the Government's argument is all the more apparent when the record is reviewed holistically, assessing the danger that this particular defendant is suggested to present. *See, e.g., United States v. Stewart*, No. 10-CR-360A, 2011 WL 5403305, at *5 (W.D.N.Y. Nov. 8, 2011) (granting bail to RICO Defendant, who was to be charged with violent crimes, where the nature of the danger was drug abuse and home incarceration and drug testing would "alleviate" *that* danger). That Defendant appears to be a follower, rather than a leader or primary actor, suggests that he might be an individual for which home incarceration with GPS monitoring could effectively mitigate the risk of dangerousness.

By communicating directly or through third persons, leaders of gangs under home-incarceration can still deploy others to carry out acts of violence. Home incarceration and electronic monitoring would thus be ineffective in keeping these leaders from commanding violence. Like a hungry, home-bound customer orders sushi while others gather the ingredients,

prepare the meal, make the delivery, in a "beef" between rival gangs, the gang leader issues an edict while other gang members assemble the crew, grab the weapons, and mete out pain. Just as the sushi restaurant cannot make a delivery unless the customer places an order, so too gang members await permission and instructions from their leaders before engaging in targeted violent activity against other gangs. Paulino places no orders; he simply participates in a larger group delivering pain.

In addition, Paulino's activities with the gang do not involve solo acts of violence. His violently swinging wooden debris at the Victim is part of a brutal group-inflicted beating that involved multiple stabs, kicks, punches, and strikes. His acts are violent, yet not essential to inflicting harm. His actions don't require special access to weapons nor do they require particularized skill. This is entirely consistent with his early 2018 case. His actions are unnecessary; he is assuredly, easily replaceable. The evidence indicates that Paulino's value to the gang is not based on his ability to strategize, motivate, or communicate. As far as the gang is concerned, Paulino's greatest asset is his physical presence coupled with his physical strength. Depriving the Trinitarios of his physical presence renders his physical strength nugatory. Home incarceration and electronic monitoring accomplish this goal.

Any suggestion that the Trinitarios may seek him out, or vice versa, while under supervision of this nature, is highly dubious. Seemingly, a criminal enterprise would want nothing to do with a non-essential member being monitored by the Government, especially since he is a mere member, as opposed to a boss or supervisor. His presence near any member of the Trinitarios would bring unwanted attention from law enforcement with no real benefit to the gang. This assumes also that Paulino would want anything to do with them, as well, such that he would be willing to circumvent the watchful eyes of his family members, who are also proposed sureties.

*Cf. Dono*, 275 F. App'x at 37 (reversing district court finding that release conditions were sufficient to overcome statutory presumption of dangerousness, despite father assuming "personal responsibility" for defendant, where defendant had made tape-recorded threats of future physical harm to victims and their families).[4]

Indeed, though Defendant's two recent violent incidents appear to have resulted from a feud between gang rivals, there is no evidence that Paulino knows any of the victims personally or would, as the Government has suggested, attempt to retaliate against them. *See* 6/22/18 Tr. at 26:3–27:7. As to the menacing incident, it does not appear that Paulino violated the order of protection over the months that followed. As to the instant offense, in the two days while Defendant was at liberty between arrests, there is no indication that he attempted to reach the victim or his family. Nor are there allegations of threats of future harm to the victims or their families, as is often present in these cases. *Cf. Dono*, 275 F. App'x at 37. Nor has the Government alleged that Defendant has tampered with witnesses or other committed other misconduct over the course of this case, a not infrequent occurrence in racketeering cases. *Cf. Combs*, 2011 WL 2110795, at *3 (considering such evidence as relevant to dangerousness determination in racketeering prosecution).

---

[4] Though the Government may suggest that Paulino's family members were previously inadequate to deter him from criminal conduct, the circumstances have now drastically changed. Moreover, such an argument would be applicable to any criminal defendant seeking home incarceration in the same setting in which they resided prior to their arrest. The Court is not prepared to reject the concept of home incarceration in such a wholesale manner.

Finally, also of note is the degree to which electronic monitoring technology has progressed since the days of *Colombo* and *Orena*.[5] As defense counsel argued, pretrial monitoring now enables a pretrial officer to track a defendant in real time, on a computer or a cell phone, so that the officer can be assured that, for example, when Paulino says he is going to the hospital, that he is in fact doing so. 6/25/18 Tr. at 28:3–9. To be sure, as the Government argued, this does not make monitoring any less reactive, and the Court cannot be assured that monitoring will occur at all hours. 6/25/18 Tr. at 34:11–35:4. However, in examining a given set of conditions, absolute certainty of their efficacy is not required, only a "reasonable assurance . . . ." *See Alston*, 420 F.2d at 178 (reasoning that "[t]he law requires reasonable assurance but does not demand absolute certainty, which would be only a disguised way of compelling commitment in advance of judgment.").

For the above-stated reasons, taken together, the Court need not merely rely on Paulino's good-faith promises that he will comply with conditions, *Orena*, 986 F.2d at 633, because the

---

[5] A radio frequency ("RF") bracelet is the more conventional "ankle bracelet" that has been used over time. *See United States v. Gambino*, 809 F. Supp. 1048, 1056–57 (S.D.N.Y. 1992), *aff'd*, 17 F.3d 572 (2d Cir. 1994) ("When a defendant is subjected to electronic bracelet monitoring, a device is usually placed around the defendant's ankle. The device transmits an encoded signal by radio frequency to a receiver located in the defendant's home and the receiver is capable of transmitting a signal by telephone to a computer at a central monitoring office at a private facility."). GPS monitoring is a more recent phenomenon that is distinct from RF monitoring. U.S. Department of Justice, National Institute of Justice, *Electronic Monitoring Reduces Recidivism* (Sept. 2011), available at https://www.ncjrs.gov/pdffiles1/nij/234460.pdf [Permanent Link: goo.gl/WakpNe]. While both units are placed on the ankle, the former tracks an offender's movements in real time, while the latter is contingent upon proximity to a base unit connected to a landline at an offender's home. *Id.* Statistically, GPS monitoring is more effective than RF monitoring at preventing recidivism. *Id.* More specifically, at least one Department of Justice-funded white paper regarding high-risk gang offenders is consistent with this conclusion, suggesting that GPS monitoring is effective at preventing recidivism, and reducing arrest for subsequent violent offenses even moreso. Stephen V. Gies et al., *Monitoring High-Risk Gang Offenders with GPS Technology: An Evaluation of the California Supervision Program Final Report* xv–xvi, 3-6, 3-8, 5-7 (Nov. 2013), https://www.ncjrs.gov/pdffiles1/nij/grants/244164.pdf [Permanent Link: goo.gl/CRKNPR]; *see id.* at 1-11 to 1-12 (surveying other studies with similar conclusions). The Court treats this statistical evidence as informative of the current efficacy of such methods (as compared to the time of *Orena*), while mindful of the pitfalls of using statistics to determine whether pretrial detention is warranted. *See, e.g.*, Megan Stevenson and Sandra G. Mayson, *Bail Reform: New Directions for Pretrial Detention and Release* (Mar. 13, 2017) (Faculty Scholarship 1745, University of Pennsylvania), http://scholarship.law.upenn.edu/faculty_scholarship/1745 [Permanent Link: goo.gl/jusVNE] (discussing how, for example, such statistics do not take into account the potentially riskier behavior of those defendants who were not released).

circumstances before the Court otherwise suggest that the conditions could be effective, which is enough in this non-presumption case.

### 2) Risk of Flight [6]

The Court reaches a similar conclusion as to risk of flight. Although Paulino spent no insignificant amount of time in the Dominican Republic during his childhood, it reasonably appears that New York City is his home and that he intends to stay here. He is an American citizen and the bulk of his family members are here, or in other nearby states. Although not currently employed, Paulino is recently employed. In addition, Paulino is expecting a newborn child in October, a significant incentive not to flee. *See United States v. Friedman*, 837 F.2d 48, 50 (2d Cir. 1988) (considering presence of children in New York area as providing incentive not to flee). He possesses only an expired passport, no known travel history beyond his travel to the Dominican Republic when he was younger, nor any enhanced ability to "evade surveillance." *See, e.g., id.* (discussing the fact that Defendant had no passport); *cf. United States v. Zarrab*, No. 15-CR-867 (RMB), 2016 WL 3681423, at *8 (S.D.N.Y. June 16, 2016) (concluding defendant was risk of flight in light of "extensive international travel").

Moreover, while the record is not perfectly clear as to Paulino's finances, counsel was appointed for him as an indigent defendant. It is thus unlikely that Defendant would even have the means to obtain a passport and/or flee the country, but the Court notes that the Dominican Republic has what appears to be a strong extradition treaty with the United States. *See id.* (putting significant weight upon defendant's "significant wealth" and "substantial resources", as well as travel to and ties to countries without extradition treaties); *see also* Extradition Treaty with the Dominican Republic, art. 2(1), Dec. 15, 2016, S. Treaty Doc. No. 114-10, available at

---

[6] Though the Second Circuit's remand order appears to seek clarification primarily as to dangerousness, the Court nonetheless states its rationale as to risk of flight out of the abundance of caution.

https://www.congress.gov/114/cdoc/tdoc10/CDOC-114tdoc10.pdf [Permanent Link: goo.gl/Vd6Yek] ("An offense shall be an extraditable offense if, under the laws of both Parties, the maximum applicable penalty is deprivation of liberty for more than one year or a more severe penalty.").[7]

To be sure, as the Government noted (6/25/18 Tr. at 22:16–23:2), Paulino is facing a much more substantial sentence than he has ever before,[8] and, as discussed above, what appears to be strong evidence against him. This provides him stronger motives to flee. *United States v. Sabhnani*, 493 F.3d 63, 76 (2d Cir. 2007). However, no mandatory minimum applies here. *Cf. English*, 629 F.3d at 317, 322 (affirming district court order of detention, reasoning that 20-year mandatory minimum sentence provided defendant incentive to flee). And, it is well-established that a greater showing than "commission of a serious crime and the fact of a potentially long sentence [is necessary] to support a finding of risk of flight." *Friedman*, 837 F.2d at 50 (surveying cases).

As to that showing, the relevant plus factors typically suggestive of a detention-worthy risk of flight are not present here. The Government emphasizes the Defendant's past bench warrants and his probation status when arrested here. However, for many of the reasons discussed above, the Court is not persuaded that this conduct is sufficiently predictive of whether he would violate conditions imposed in this case by fleeing. Notably, Defendant was released, albeit for only approximately forty-eight hours (6/25/18 Tr. at 31:23–25), between his first arrest and interview

---

[7] It is no secret that life is exceptionally difficult for deportees (which Paulino is not) to the Dominican Republic on account of criminal conduct. *See* Charles R. Venator Santiago, *Deporting Dominicans: Some Preliminary Findings*, 14 Harv. Latino L. Rev. 359, 373 (2011) (discussing extensive government efforts to stigmatize criminal deportees, including publishing their pictures and names prior to their arrival from the United States). Thus, even if Paulino could evade extradition, he would likely have tremendous difficulties navigating life in the Dominican Republic, making flight even less appealing.

[8] At oral argument, the Government indicated that, upon "reevaluation of the evidence," there was "sufficient evidence to show that the offense could have qualified for first-degree murder," which would result in a higher Guidelines calculation of 235 to 293 months' incarceration. 6/25/18 Tr. at 11:24–12:23.

and his arrest on the charges presented here, and thus, despite anticipating possible charges, made no efforts to flee. *See, e.g., Friedman*, 837 F.2d at 50 (considering that Defendant took "no steps" to flee jurisdiction in three-week period between execution of search warrant at home and arrest).

To be sure, reasonable minds may differ about the degree to which such a calculus changes for a defendant once he faces *actual* charges. *See, e.g., United States v. Khusanov*, No. 18-217-CR, 2018 WL 1887339, at *2 (2d Cir. Apr. 20, 2018) (finding district court did not abuse discretion in ordering defendant detained, in presumption case, where "the court could think that a defendant would perceive a greater threat to his liberty—and, therefore, posed a greater risk of flight—when he faced actual charges rather than simply anticipated possible charges) (citing *United States v. Jackson*, 823 F.2d 4, 6–7 (2d Cir. 1987)). But where, again, the Government has not presented sufficient evidence that Paulino will engage in intentionally evasive conduct or use sophisticated means to circumvent the Court's orders,[9] the Court can only speculate that the circumstances would be different now that he actually faces these charges. *See Friedman*, 837 F.2d at 50 (distinguishing *Jackson* as a case where Defendant "had used a number of aliases, had lived from hotel to hotel, had shown skill in avoiding surveillance, and had hidden assets"). This is not sufficient to satisfy the Government's burden. *Id.*

Moreover, the conditions set by Judge Pitman reasonably assure that Defendant will not flee. When I probed the Government on the adequacy of home incarceration and electronic monitoring at oral argument, counsel rightly pointed to Paulino's prior difficulties complying with supervised release. 6/25/18 Tr. at 23:14–24:3, 33:3–23. The problem with this argument, however, is that, even putting aside the lack of a meaningful and consistent pattern of Defendant's

---

[9] Notably, as discussed further above, in each of his last two arrests, Paulino appears to have been the only one arrested among the members of the groups. In the menacing incident earlier this year, Paulino was left to flail his body as officers arrested him. While this unproven allegation certainly suggests a disrespect of law enforcement, his repeatedly being left behind demonstrates a certain lack of sophistication.

non-compliance, his prior failures to appear in court and committing an offense while on supervised release are one thing; evading home confinement and electronic monitoring to affirmatively flee, is another.

As discussed *supra*, electronic monitoring technology has progressed since the *Colombo-Orena* era, and absolute certainty of their efficacy is not required, only a "reasonable assurance . . . ." *See Alston*, 420 F.2d at 178 (reasoning that "[t]he law requires reasonable assurance but does not demand absolute certainty, which would be only a disguised way of compelling commitment in advance of judgment."). Given Paulino's indigency, it is safe to say that he is not of the financial means of the *Sabhnani* Defendants, thus foreclosing the possibility of private security guards or Defendant's being able to pay for any proposed surveillance methods.[10] All factors taken together, the Court is reasonably assured regarding the conditions proposed here.

Thus, because the Government's arguments are founded upon layers of speculation regarding Paulino's inability to comply with Judge Pitman's conditions, the Court concludes that the Government has not met its burden.

---

[10] The Court pauses to note that some courts in this Circuit—though not all—have sanctioned the possibility of releasing defendants who are financially able to replicate a private jail at their own expense *See, e.g., United States v. Dreier*, 596 F. Supp. 2d 831, 833 (S.D.N.Y. 2009) ("It cannot be gainsaid that many kinds of bail conditions favor the rich, and conversely, that there are many defendants who are too poor to afford even the most modest of bail bonds or financial conditions of release. This is a serious flaw in our system. But it is not a reason to deny a constitutional right to someone who, for whatever reason, can provide reasonable assurances against flight."). *But see, e.g., United States v. Agnello*, 101 F. Supp. 2d 108, 115 (E.D.N.Y. 2000) ("Nor do I think a wealthy defendant is entitled to greater consideration in the making of a bail decision than a defendant of modest means. Just as Congress provided in the Bail Reform Act that the court 'may not impose a financial condition that results in the pretrial detention of the person,' 18 U.S.C. § 3142(c), Congress did not intend that a dangerous individual should be released because that individual was sufficiently affluent to be able to pay the cost of extravagant release conditions monitored by private security officers."). Though the Court firmly believes that the home incarceration and GPS monitoring imposed by Judge Pitman are sufficient in this case for the reasons set forth herein, it acknowledges that private security guards might be even more effective at mitigating the minimal risk that Paulino leaves his home to meet other Trinitarios and commits another offense. This case underscores the inequity of allowing private security guards as a bail condition, given that an individual such as Mr. Paulino, like many defendants in the criminal system, does not have the resources to assemble such a bail package.

## CONCLUSION

For the above-stated reasons, the Court adheres to its original determination that the Government has failed to adequately demonstrate that no conditions would reasonably assure that Defendant appears in court and reasonably assure the safety of the community. The conditions set by Judge Pitman are more than adequate in light of the record before the Court. As such, the Government's appeal of Judge Pitman's bail determination is denied.

Defendant's release is stayed for an additional three business days following the issuance of this order, so that the Government may, if it so chooses, restore the matter to the active docket of the Second Circuit by letter, and pursue a further stay.

**SO ORDERED.**

Dated: August 16, 2018
    New York, New York

_____
    **ANDREW L. CARTER, JR.**
    **United States District Judge**